JULIO D. SILVA, Appellant, *v.* INDUSTRIAL COMMISSION OF PUERTO RICO, ETC., Defendant; STATE INSURANCE FUND, Intervener.

No. CI-64-13.     Decided March 11, 1965.

*Enrique Báez García* for appellant. *Donald R. Dexter* for the State Insurance Fund.

Division composed of Mr. Justice Pérez Pimentel, as Chief Judge of Division, Mr. Justice Rigau, and Mr. Justice Dávila.

MR. JUSTICE RIGAU delivered the opinion of the Court.

This case is of relatively slight pecuniary importance, but it presents an ethicojuridical problem on which we must pass judgment. The facts may be summed as follows: Silva, an employer insured with the State Insurance Fund, contracted the services of Vicente López in order to perform with other workers some repairs in his house. Vicente López, a carpenter, was authorized by Silva to procure the services of an assistant. López did so, but shortly after commencement of the work the assistant became ill. López informed Silva and the latter told him to find another one. López brought his son Roberto to work as his assistant. Roberto sustained an accident in the course of said work. The Manager of the State Insurance Fund awarded him an indemnity of $2,250.

Eleven months later the father and the minor resorted to the Fund for the purpose of collecting from the employer the penalty imposed by law in the case of unlawfully employed minors under 18 years, which penalty is equal to the sum of the compensation ordinarily accruing to the injured worker in each particular case. Section 3, Act No. 45 of April 18, 1935, as amended; 11 L.P.R.A. § 3, 1962 ed., p. 30. In this case the penalty would therefore be $2,250. The Manager imposed the same upon the employer and the latter, feeling aggrieved, appealed to the Industrial Commission.

In the Commission the case was heard before one of the three commissioners, namely, the Chairman, Mrs. Raquel Nigaglioni. For the reasons which we shall presently see, the Chairman ruled in favor of the employer, but since the other two commissioners were not agreeable with her ruling, her

decision became dissenting opinion and the vote of the other two commissioners prevailed.

What we have recited so far on the facts of the case is not in issue. Yet, the Commission was divided because there is a conflict in the evidence which it had under consideration. Such conflict lies in the following: Minor Roberto López testified that the employer never asked him his age; that he only worked two days for the employer because the accident occurred on the second day. In explaining how he came to work for Silva, he said: "He sent for my father, who was a carpenter, and asked him to find a helper, and my father brought me." He also testified that he did not have a social security card at that time. The father, Vicente López, testified that he did not tell the employer that his son did not have a permit from the Labor Department;[1] that he told the employer that his son was 17 years of age, and that Silva told him to put him to work; that his son had a social security card; that the employer did not ask him to show him the minor's social security card, but that he told the employer that he had it; that he (the father) had it in his pocket when he spoke with Silva.

Employer Silva testified that he never interviewed the minor because his working hours in the post office of Mayagüez prevented it; that when the assistant carpenter became ill, he authorized Vicente López to find another and that López then told him that he had a son 18 years of age who had worked before and had a social security card; that he asked the father the age of his son Roberto, to which the former answered that he was 18 years old; that he believed what the father told him.

It also appears from the evidence that while the case was being investigated in order that Roberto López could collect from the Insurance Fund the indemnity awarded by the

---

[1] Permit required by law since the minor in question is under 18 years, 29 L.P.R.A. § 431 et seq.

Manager, Roberto gave a sworn statement in which, when he was asked his age, he said that he was 18 years of age. The father, Vicente López, gave another sworn statement before the Fund investigator, and when he was asked who had engaged Roberto to do the repair work in Silva's house, Vicente López answered the following: "He [Silva] asked me to find a boy, and I said, well, if you are going to find a boy, I have a son age 17, and he was only 16 years, and he told me to bring him."

It also appears from the evidence that Roberto López, notwithstanding he was a minor under 18 years, had worked for other employers before and after the accident object of this case, and that on those occasions Roberto and/or his father lied on the minor's age and used the trick of the social security card.

The position of employer appellee is that he was deceived as to Roberto López' age, and that he should not be penalized for being misled by those who now seek to benefit by their deceitful conduct. That is essentially the position of the Chairman of the Industrial Commission. The position of the two commissioners, which prevailed, is that the law prohibits the employment of minors under 18 years;[2] that the employer violated the law in employing minor Roberto López; that he is therefore bound to pay the penalty imposed; that the employer may not set up the defense that he was deceived on the minor's age since, "in order that this defense may prosper, the law requires that the declaration be made in a sworn statement, according to the case of *Heirs of Lledó* v. *Industrial Commission*, 65 P.R.R. 404 (1945)"; and that the doctrine of unjust enrichment cannot be successfully alleged as being "extraneous" to the Workmen's Accident Compensation Act.

---

[2] With exceptions which are not pertinent here, 29 L.P.R.A. § 431 *et seq.*

We are ruling in favor of appellee-appellant, and the following are the grounds of our ruling.

■ In the first place, the majority opinion of the Commission is not correct in stating that the employer cannot allege as a defense that he was deceived, and in adding that the law requires that the deceitful declaration must appear in a sworn statement. In thus deciding this case on February 19, 1964, the facts of which occurred in October 1961, the Commission apparently read the text of § 3 of the Workmen's Accident Compensation Act, No. 45 of April 18, 1935, as amended by Act No. 162 of May 14, 1943, Sess. Laws, p. 548, the text of which actually required the requisite of the sworn statement, but that is no longer the law in force, nor at the time of the occurrence of the facts of this case, nor at the time of the Commission's decision. That requisite was eliminated when § 3 *supra* was amended by Act No. 284 of May 15, 1945, Sess. Laws, p. 1056. The case of *Heirs of Lledó* v. *Industrial Commission, supra,* cited by the Commission, was decided under the Act of 1943, and, consequently, does not govern this point. That was our holding in *Roig* v. *Industrial Commission,* 88 P.R.R. 59 (1963). Moreover, if the legislative intention were to prevent the employer from defending himself under those circumstances, why does the Act prescribe, after providing for that additional compensation, that "the Manager of the State Insurance Fund shall, before collecting such additional compensation from the employer, transfer the record to the Industrial Commission in order that the latter may give the employer and the workman opportunity to be heard in their defense?" Laws of 1943, p. 548; Laws of 1945, p. 1056; Laws of 1953, p. 430; Laws of 1957, p. 455; Laws of 1960, p. 289; 11 L.P.R.A. § 3, 1962 ed., p. 30.

It should be recalled that the Workmen's Accident Compensation Act of 1935, *supra,* made no provision for additional compensation in the case of minors under 18 years.

The amendment made to that Act by Act No. 74 of April 26, 1940, did not touch that point. That penalty of additional compensation to be paid by the employer was first inserted by Act No. 52 of April 25, 1942, Laws, p. 518. By virtue of the aforesaid Act No. 162 of 1943, the so-called only two defenses were inserted, but that was eliminated by Act No. 284 of 1945, *supra*. However, the provision giving the workman and the employer the right to be heard and to defend themselves before the Industrial Commission was not altered.

■ In the second place, we uphold the weighing of the evidence made by the Chairman of the Commission, who was the only member of that agency who saw and heard the witnesses. We believe that the Chairman of the Commission stated correctly in her dissenting vote the following:

"We have the power and the duty to give the employer 'an opportunity to be heard and to defend himself,' and the employer's defense is that he is not liable for payment of the additional compensation, since he was misled by the injured's father and the injured himself by concealing the minor's true age. Upon examination of the evidence, it is necessary to consider that we act in this case as trier. That is to say, we had an opportunity to preside the hearing and to confront the witnesses and their statements. This is an important factor which must not be overlooked, since there is occasion to observe the attitudes, hesitations, modulations, gestures, etc. Hence, the conduct at the witness stand is many times a controlling factor in the decision of a case. Owing to this circumstance, we said in our former vote that the father as well as his son impressed us as not being very convincing in their testimony. In other words, the writer cannot disregard that fact and adhere strictly to the stenographic record without evaluating the foregoing."

Even from a reading of the transcript of the evidence and of the sworn statements of Víctor López, Roberto López, and Julio Silva, we have reached the same conclusion as the Chairman. From those documents it appears clearly and unquestionably that Víctor López did not tell the truth to Julio

Silva, and that Roberto López lied under oath to the State Insurance Fund investigator.

In the third place, we do not agree with the majority position adopted by the Commission in this case in the sense that the doctrine of unjust enrichment does not apply in this field as being extraneous thereto. If we were satisfied with citing the precedent, we could end here the discussion of that argument by citing the case of *Compañía Popular de Transporte* v. *District Court*, 63 P.R.R. 116 (1944), in which we already applied in labor law the doctrine of unjust enrichment, but we are interested in considering the argument on the merits since, as a juridico-philosophical position, we must reject it.

In considering the doctrine of unjust enrichment, it must be readily borne in mind that it is not a particular provision of law to be applied only to the specific situation described in the statute, a situation which may present itself one or many times. An example would be § 700 of the Civil Code, which provides that "When the testator appoints to the succession a person and his children, they shall be understood as designated simultaneously and not successively," 31 L.P.R.A. § 2289. That is a rule designed for a specific situation. That section could hardly be applied to other situations not comprised within its own terms.

■ This is not the situation with the principle under consideration. This is a general doctrine or principle of law which may be applied to situations quite different from each other, provided they have an element in common: that its nonapplication would perpetuate the inequity that someone may unjustly enrich himself at the expense of another. It is a general doctrine based on equity,[3] upheld by the law

[3] *Compañía Popular de Transporte* v. *District Court*, 63 P.R.R. 116, 123 (1944); I-II Castán, *Derecho Civil Español, Común y Foral* 570 (9th ed.); III Valverde, *Tratado de Derecho Civil Español* 643 (3d ed.); Allen, Law in the Making 318 (3d ed.); I Pound, Jurisprudence 415;

of all civilized countries,[4] which governs, and shall growingly govern, many personal relations,[5] susceptible of application in a number of cases which cannot possibly be foreseen.[6]

It is true that traditionally this doctrine was discussed in the treatises on contracts and quasi-contracts, but already it is considered, as it ought to be, as a general principle which operates in the entire field of the law and which is not based on the existence of a contract.[7] We believe that a brief historical review sheds light on these concepts.

The doctrine of unjust enrichment is as old as the law itself. It is a corollary of the concept of equity, which is tantamount to saying that it is a corollary of the concept of justice itself.

■ Equity, as is known, means something which is just. As a concept operative in the application and development of the law, equity comes to Puerto Rico through the continental European civil or Romanized law, that is, through the Spanish civil law. We must recall the famous section of almost all Civil Codes, which in our Code is § 7, which provides that "When there is no statute applicable to the case at issue, the court shall decide in accordance with equity, which means that natural justice, as embodied in the general principles of jurisprudence and in accepted and

VI Planiol, *Tratado Elemental de Derecho Civil* 617 (1945), Spanish translation of the French 12th ed., Mexico.

[4] *Compañía Popular de Transporte* v. *District Court, supra* at 123; Valverde, *ibid.*; II-II Puig Brutau, *Fundamentos de Derecho Civil* 605; Friedman, Legal Theory 506 (4th ed.); Allen, *op. cit.* at 329; Friedman, Law in a Changing Society 456 (1959).

[5] *Compañía Popular de Transporte* v. *District Court, supra* at 122; Valverde, *ibid.*; Planiol, *ibid.*

[6] Valverde, *ibid.*; Castán, *ibid.* at 572; Nicholas, *"Unjustified Enrichment in the Civil Law and Louisiana Law,"* 36 Tulane L. Rev. 605, 606 (1962).

[7] *Compañía Popular de Transporte* v. *District Court, supra* at 123; VIII Planiol y Ripert, *Tratado Práctico de Derecho Civil Francés* 53 (Cultural ed., Havana).

established usages and customs, shall be taken into consideration." In Anglo-Saxon law, before the English law bifurcated into the two streams of "common law" and "equity," both streams of law, in England as well as in Continental Europe, were fused into only one. It was for merely historical reasons, and not for theoretically necessary reasons, that the bifurcation took place in the English law (to merge again both streams in the modern American law where in many jurisdictions they are no longer separated). That division did not take place in Continental European law, civil or Romanized, and for that reason now, as before, equity is the yeast which promotes the development of the civil law within itself, without being a separate branch or jurisdiction.

As we have suggested, it was like this at the beginning. Although dualism between the formal law or strict law and the equitable law also existed in Rome, there the *ius civile* and the *ius praetorium* were applied by the same court. The English law, before the bifurcation which we have mentioned, received substantial contribution from the Roman and canon laws, a part of which was the influence of the Roman-canon *aequitas* in the initial development of the English equity. Before the Reform, the chancellors (Justices of the Courts of Equity) had almost always been chosen from among the ecclesiastics who had studied in the schools of Roman law and of scholastic philosophy, and they were the ones who framed mostly the "equity" as a supplementary system of the common law. For that reason, as we have stated above,[3] it may not seem strange that the English equity sprang from the Roman-canon *aequitas* of which it is a continuation. The first English courts of equity were also called "courts of conscience" owing to their mitigating and corrective function of the common law, a function which they performed better before their procedure was frozen into rigid formulas.

---

[3] *United Hotels of P.R.* v. *Willig,* 89 P.R.R. 185 (1963), n. 2.

The excessive formalism which equity acquired later defeated in a great measure its essence and purpose. Of course, already modern juridical science has revendicated the substance of the law placing it in the higher rank to which, as ethical and juridical value, it is entitled in relation to the formalities.[9]

Because it must have happened in very ancient times, it is impossible to say what thinker first conceived in his mind and proposed the concept of equity in connection with the application of the law. It seems certain that that concept occurred to many when they came in contact with the Code of Hammurabi approximately 4,000 years ago. Limiting our inquiry to the direct sources of our occidental thought, we find discussions of this concept in the classical Greece and, specifically, in Plato and Aristotle. Since the concept of equity in our law always was, and continues to be, the Aristotelian concept of mitigation of the law by means of equity to make the law just in those cases where because of their particular circumstances the application of the law would have worked an injustice,[10] we believe it is of interest to copy the very words of Aristotle on this matter. After all, it is not frequent that from our fabrile and febrile times we turn our eyes to that aurora which was Greece, and no harm can come in briefly doing it now. Those words are:

"The source of the difficulty [in the case of equity] is that equity, though just, is not legal justice, but a rectification of legal justice. The reason for this is that law is always a general statement, yet there are cases which it is not possible in a general statement. In matters therefore where, while it is necessary to speak in general terms, it is not possible to do so cor-

---

[9] Allen, Law in the Making 305–49 (3d ed.); Friedman, Legal Theory 493–96 (4th ed.); Castán, *La Formulación Judicial del Derecho* 26–95 (2d ed. 1954); Maine, Ancient Law 42–69 (3d American ed., 1888).

[10] Castán, *La Formulación Judicial del Derecho* 88 (1954); Friedman, Legal Theory 494 (1960).

rectly, the law takes into consideration the majority of cases, although it is not unaware of the error this involves. And this does not make it a wrong law; for the error is not in the law nor in the lawgiver, but in the nature of the case: the material of conduct is essentially irregular. When therefore the law lays down a general rule, and thereafter a case arises which is an exception to the rule, it is then right, where the lawgiver's pronouncement because of its absoluteness is defective and erroneous, to rectify the defect by deciding as the lawgiver would himself decide if he were present on the occasion, and would have enacted if he had been cognizant of the case in question. Hence, while the equitable is just, and is superior to one sort of justice, it is not superior to absolute justice, but only to the error due to its absolute statement. This is the essential nature of the equitable: it is a rectification of law where law is defective because of its generality."*

Turning to the Roman Law, the judgments of Pomponius collected in *Corpus Juris Civilis* are well known: "Natural justice requires that no one should be enriched at the expense of another." *Digest* 12.6.14. "It is in accordance with natural equity that no one become richer by reason of someone else's loss." *Digest* 50.17.216. In order to correct that "injury to equity," as Castán calls the unjust enrichment,[11] the Roman law granted a number of actions called "condictiones." The Roman solutions were adopted by the old Spanish common law.[12] The Spanish Civil Code, unlike the German Code, did not provide a systematic organization of this matter, but the concept is dispersed throughout its articles. The same situation exists in our Civil Code, which is understandable since ours was taken from the Spanish Code. Thus, Professor Velázquez, commenting our Code, points out the following:

---

* The English translation was copied from The Great Legal Philosophers, p. 23, ed. by Clarence Morris (1957).

[11] I–II Castán, *op. cit. supra* at 570.

[12] As is known, there is also a common law in Spain which should not be confused with the Anglo-Saxon common law.

"One of the fundamental principles established in the Civil Code is, in effect, that no one may unjustly enrich himself at the expense of another.

"This principle is not expressly consecrated in the Civil Code. But it makes numerous applications thereof. See, in effect, §§ 296, 297, 300, 301 (31 L.P.R.A. §§ 1163, 1164, 1167, 1168), relative to accession; 381, 382, 383 and 384 (31 L.P.R.A. §§ 1467–70), relative to possession; 1117 (31 L.P.R.A. § 3167), relative to payment; 1304 (31 L.P.R.A. § 3644), relative to community property; 1407 (31 L.P.R.A. § 3912), relative to redemption; 1679 (31 L.P.R.A. § 4681), relative to depositum; 1766 (31 L.P.R.A. § 5025), relative to pledge, etc. See, in particular, §§ 1795–801 (31 L.P.R.A. §§ 5121–27), relative to collection of what is not due. In view of the multiplicity of these special texts, it must be necessarily admitted that the Civil Code embraces a set of provisions showing that the lawmaker has recognized in a general way the existence of the principle in question. Furthermore, according to Planiol, that principle imposes itself as a necessary rule of equity, being 'one of those odd rules of natural law which govern all laws, even though the lawmaker has not taken special pain to formulate them.'" *Las Obligaciones Según el Derecho Puertorriqueño* 133 (1964).

Thus, as pointed out by Puig Brutau, the law on unjust enrichment is still in its formative stage at the hands of the Courts.[13]

After those considerations on the development of these concepts, we come to the case at bar. In view of claimant's deceit, the Commission is of the opinion that we should apply blindly the letter of the law and impose upon the deceived appellee the economic penalty for the benefit of the deceivers. We are not willing to do that. In Roman law the vice of invoking the literal application of the law for the purpose of obtaining undue advantage was called *subtilitas.* The *subtilitas* was considered as one form of *dolus malus,* and it is idle to say that justice and law do not suffer *dolus malus.*[14]

---

[13] II–II Puig Brutau, *op. cit. supra* at 606.

[14] Allen, *op. cit.* at 319.

*Fraus et jus nunquam cohabitant.*

As correctly pointed out by Castán, "the concepts of justice and equity are essential and cosubstantial to the notion of Law, which would fail to accomplish its moral and social purpose if it did not aspire to do justice, not an abstract and theoretical justice, but realistic and humane justice." The author calls the use of equity an "irreplaceable exigency." "In substance," says the author, "the judge owes obedience to the law, and the best way of serving it is by realizing it in its inspiring purpose, that is, in justice, which constitutes its profound content."[15]

The majority opinion argues, as we said before, that the doctrine of unjust enrichment does not apply in this field. We have seen that this is not so. The law is not divided into hermetic compartments. What happens is that, for didactical purposes and of exposition, the law is classified into matters, but they grow and enrich themselves with the developments in the entire field of the law, and the new trends in one field exert influence on the others.[16]

The great doctrines of the law are underlying ideas which form the foundation of the entire law. Every legal system deserving such a name is founded on an ideal of justice, the content of which depends in turn on the ethical, political, and social values;[17] and, as rightly stated by Del Vecchio, there should exist some relationship between the general principles and the particular norms of the law—and the

---

[15] *La Formulación Judicial del Derecho* 87, 102, and 115 (1954).

[16] See, for example, the recent developments in torts and social security due to the socializing trends of contemporary law in Friedman, Law in a Changing Society (1959). See, also, Rodríguez Arias, *Orientaciones Modernas del Derecho Civil* in *Rev. Gen. de Legis. y Juris.* 393 (1964); Castán, *"La Socialización del Derecho"* in the same review at pp. 279–80 (1915); and Castán, in *La Ordenación Sistemática del Derecho* 121 (1954).

[17] Friedman, Legal Theory 503 (4th ed.).

judicial decisions, we believe—so that there be no lack of harmony between one and the other.[18]

■ There is no question that complainants are precluded from proceeding against their own acts. This principle, based also on ethical and equitable reasons, also permeates through the law. Indeed, its application presupposes a decided intervention of the judicial discretion. As pointed out by Puig Brutau, "one who has given occasion for a deceitful situation . . . cannot make his right prevail over that of one who has confided in such appearance."[19] As is known, in the Anglo-Saxon law the doctrine of estoppel is the equivalent of the doctrine of one's own acts of our law. For an interesting comparison of both ideas, see the book cited by Puig Brutau, *Estudios de Derecho Comparado* 97–136.

We are aware that it is easier to be generous than to be just, but our sense of duty precludes us from taking the easiest way out if it is at variance with justice. We cannot impose a sentence upon appellee for acts motivated by complainants' deceit and much less since the beneficiaries of such judgment would be the deceivers. If this had been the situation, it would be a clear case of unjust enrichment and there is no question that we would have been able to cure that "injury to equity." Similarly, we can prevent it. It is well to recall the following thought of Del Vecchio: "The jurist, and the judge in particular, should—whenever possible—control and practically impart life to the entire system, feel its spiritual unity, from the remote and implied premises to the most insignificant precepts, as if he were the author of it all and the law were speaking through him; in this sense, we could subscribe to the sublime ideal on which Aris-

---

[18] *Los Principios Generales del Derecho* 61 (1948), 2d Spanish ed., translation by Ossorio Morales.

[19] *Estudios de Derecho Comparado* 103 (1951).

totle was inspired in defining the judge as the living just."[20]

Summing up: (1) In similar situations the parties may set up defenses upon availing themselves of the "opportunity to be heard and defend themselves" given them by law; (2) in this particular case the defense alleged by appellee is sufficient and was established; (3) the doctrine of unjust enrichment may be applied in this field when essential to the administration of justice.

The decision entered by the Industrial Commission in this case will be set aside.